

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00349-CV

**IN THE INTEREST OF A.L.R.**, a Child

From the County Court at Law, Val Verde County, Texas
Trial Court No. 3688CCL
Honorable Sergio J. Gonzalez, Judge Presiding

Opinion by:  Luz Elena D. Chapa, Justice

Sitting:  Sandee Bryan Marion, Chief Justice
Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed: November 6, 2019

REVERSED AND RENDERED IN PART AND REMANDED IN PART

J.R.[1] appeals the trial court's order that terminated his parental rights, arguing legally and factually insufficient evidence supports the trial court's order. We hold there is legally insufficient evidence to support the finding that termination of J.R.'s rights is in the child's best interest, and we therefore reverse the part of the trial court's order that terminated J.R.'s parental rights.

### FACTS AND PROCEDURAL BACKGROUND

A.L.R. was born February 27, 2018 to J.R. and E.B. A month later, the Department of Family and Protective Services filed an original petition for conservatorship of A.L.R. and for termination of her parents' rights. The affidavit filed in support of the petition asserted that

---

[1] To protect the identity of the minor child, we refer to the parents and child by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

removal of A.L.R. was sought because there was an open case in the Department involving E.B.'s three other children. That case arose out of the October 2017 death of another of E.B.'s children, K.A. The affidavit stated allegations of abuse and neglect had been made against E.B., J.R., and J.R.'s parents as a result of the child's death and that J.R. had been arrested and was in jail in connection with the child's death. The Department sought A.L.R.'s removal from E.B. because E.B. was living with J.R.'s parents, and the Department was concerned the child should not be in that home.

After the adversary hearing held April 9, 2018, the trial court appointed the Department A.L.R.'s temporary managing conservator and the parents temporary possessory conservators. The court allowed E.B. to have twice-monthly supervised visitation with A.L.R.; however, the court ordered that J.R. have no access or possession of the child. The Department placed A.L.R. with E.B.'s mother and step-father, who also had possession of E.B.'s other three children, and A.L.R. remained in their care throughout the case. No child support was ordered.

In the fall of 2018, the grand jury declined to indict J.R. on any charges related to the death of K.A. However, J.R. had been convicted in 2016 of burglary of a habitation and placed on probation. In January 2018, while J.R. was in custody in connection with K.A.'s death and before A.L.R. was born, J.R.'s probation was revoked, and he was sentenced to five years in prison. After J.R. was no-billed by the grand jury, he was moved from Val Verde County and taken into state custody to serve that sentence. J.R. was in prison at the time of this trial in May 2019, and the undisputed evidence was that he would be released by August 2019.

The case was tried to the court on May 7, 2019. The only witnesses were the Department's case worker, a Department investigator, and J.R. The Department advised the court it was no longer seeking termination of E.B.'s rights and had reached a partial agreement with E.B. At the conclusion of the trial, the court found that appointment of a parent or both parents as A.L.R.'s

managing conservator would not be in her best interest because such an appointment would significantly impair the child's physical and emotional development. *See* TEX. FAM. CODE § 153.131. The court appointed E.B.'s mother as A.L.R.'s permanent sole managing conservator and appointed E.B. a possessory conservator. The court found by clear and convincing evidence that termination of J.R.'s parental rights was authorized by sections 161.001(b)(1) (C), (D), (E), (N), (O), and (Q) of the Texas Family Code and that termination of his rights is in A.L.R.'s best interest. *See id.* § 161.001. On appeal, J.R. challenges the legal and factual sufficiency of each of the trial court's findings under section 161.001(b)(1) and the trial court's finding that termination of J.R.'s rights is in A.L.R.'s best interest.

### *The Evidence*

Carlissa Ramos testified she had been A.L.R.'s Department caseworker since April 2018, when the Department was appointed A.L.R.'s temporary managing conservator. At the time of trial, A.L.R. was fourteen months old and had lived with her maternal grandparents since shortly after she was born. Ramos testified that A.L.R.'s maternal grandmother is protective of A.L.R. and is meeting all her needs. She stated that A.L.R. is bonded to them and to her three half-siblings who are also placed in the home. E.B. is the possessory conservator of her three other children and she visits at the home several times a week.

Ramos testified J.R., A.L.R.'s father, is in state prison, and the Department introduced a copy of the judgment revoking J.R.'s probation and sentencing him to five years in the Texas Department of Criminal Justice – Institutional Division. The judgment recites J.R. was placed on ten years' probation in February 2016 for committing burglary of a habitation in 2015, and that J.R. pled true to violating a condition of his probation. The judgment does not state what condition was violated. The January 18, 2018 judgment revoked J.R.'s probation and reduced his sentence to five years, with credit given for 197 days served. No further evidence was presented regarding

the circumstances surrounding the original burglary offense or of the condition of probation that J.R. violated. Ramos testified that J.R. expected to be released from prison in August 2019.

Rustee Flood is a conservatorship worker for the Department; she was previously an investigator and received the initial referral in this case. Flood testified the initial referral was made when A.L.R. was born because her mother, E.B., had an open case involving her other three children. That case was opened when another of E.B.'s children, K.A., died. When asked about the circumstances of K.A.'s death, Flood testified as follows:

> A. That he essentially he died in the home where [J.R.] and his parents were present. He didn't die in the home. He sustained injuries that then caused him to have to go into the hospital and be admitted due to some extensive current and previous injuries and he ended up unfortunately passing due to those injuries sustained in that home while in the care of [J.R.] and his parents.
>
> Q. And what was the severity level of the injuries to that particular child?
>
> A. He had some rib injuries. He had some head trauma. There was some different level of bruising throughout his body. There was a big knot on his forehead, some bruising on the face, and at the end of all of that after trying to get the care to get [sic] help him he ended up passing.
>
> Q. Okay. What was the result of the Department's investigation after the death of [K.A.]?
>
> A. The paternal grandparents, Ms. R.[] and Mr. R.[] they were both found for neglectful supervision. They were both reason to believe. [E.B.] was reason to believe for neglectful supervision and [J.R.] was for physical abuse as well as neglectful supervision.
>
> Q. Was the Department ever able to identify who could have caused the injuries to that particular child?
>
> A. The Department concluded that the injuries were sustained due to [J.R.].

No other evidence was presented regarding the circumstances or causes of K.A.'s injuries and subsequent death. And no evidence was presented about any conduct or failures to act on the part of J.R., his parents, or E.B. Flood acknowledged that J.R. was not prosecuted on any charges arising from K.A.'s injuries or death, and there was no evidence that his parents were charged.

Flood testified the Department learned that E.B. intended to keep A.L.R. in her care when she was discharged from the hospital after giving birth, and that she intended to return with A.L.R. to J.R.'s parents' house, where she lived. Flood testified the Department filed the current suit because the Department believed the home posed a threat to the safety of A.L.R.

The record reflects the Department did not intend to seek reunification of J.R. with his daughter and it did not prepare a service plan for J.R. until the trial court ordered it to do so in May 2018. Ramos testified the Department thereafter prepared three service plans for J.R. to assist him in trying to regain possession of his child. Flood testified she prepared the first plan in June, but she did not attempt to meet with J.R. to discuss the plan and never showed it to him because she had been advised not to contact him while K.A.'s death was being investigated. Likewise, Ramos testified the District Attorney had instructed the Department not to speak to J.R. In an order dated September 11, 2018, the trial court noted that J.R. still had not been given a service plan and ordered a plan to be prepared. A plan containing services that were available in the Val Verde County jail was then prepared and presented to J.R., who then reviewed and signed it on September 28, 2018. However, soon thereafter, when the grand jury declined to indict J.R. in connection with KA's death, J.R. was taken into state custody and moved to another facility. In November, the trial court ordered the Department, J.R., and his attorney to create a new plan that took into account the available services. That plan was completed and signed on December 21, 2018.

The final plan contained three requirements J.R. was required to fulfill before he was released from prison: submit to a DNA test, submit to a psychological evaluation, and enroll, participate, and complete the Changes Life Skills Program. Ramos testified the only part of the plan J.R. completed was the DNA test. She testified she arranged with jail officials for J.R. to have a psychological examination on September 20, 2018, but that J.R. refused to participate. Ramos testified the Department did not schedule a psychological examination for J.R. any time

after he had reviewed and signed the family service plan. She stated she had tried to speak to state prison officials to schedule an examination, but her calls were not returned. J.R. testified that the Hamilton Unit, where he was housed at the time of trial, allows visits by outside psychologists. He also testified that he tried to comply with the plan requirement by asking for an evaluation by the staff psychologist at the Hamilton Unit. Although the testimony is unclear, it appears J.R. had been partially evaluated at the time of trial, with another evaluation session scheduled. J.R. testified he had asked for a written report, but none had yet been prepared.

Ramos testified the Changes Life Skills Program required by the service plan was available at the Dominguez Unit, where J.R. was housed in December 2018 when he signed the plan. The record does not reflect why J.R. did not complete the program at that time. J.R. was moved to the Hamilton Unit in early 2019, and he testified that he was enrolled in the program at the time of trial. He and Ramos both testified that J.R. had also taken and completed a parenting class.

Caseworker Ramos testified J.R. had expressed a desire to complete other services, but there are not many offered at the Hamilton Unit and the Department is not able to schedule services at state prisons. She testified J.R. had done everything he could do to comply with the plan since it was presented to him. She acknowledged that the plan stated J.R. was taking classes to prepare for his release from prison and that he intended to provide a safe environment for his daughter upon his release. Ramos testified she did not have any reason to believe J.R. would not follow through with his plan.

Ramos testified that at the time of trial, J.R. did not have a home or employment, and had not been able to demonstrate an ability to properly parent A.L.R. because he had been incarcerated since she was born. Ramos testified J.R. had not provided any financial assistance to A.L.R. while the case was pending, but that he had requested that his parents' home be studied as a placement while the case was pending and while he was in prison. Nothing in the record suggests a home

study was ever conducted, but Flood testified J.R.'s parents' home was not an appropriate placement because they were "given a disposition of reason to believe for neglectful supervision which ultimately led to [K.A.'s] death."

Ramos testified J.R. has demonstrated a desire to know and become acquainted with his child. However, J.R. has never had a visit with A.L.R. because he has been in jail since before she was born. The record reflects the trial court's orders precluded J.R. from having any access to A.L.R. until J.R. was released from prison, and Ramos testified the Department never attempted to get permission for J.R. to see his daughter. However, in September 2018, at J.R.'s request, the trial court ordered the Department to send him pictures of A.L.R. J.R. testified he received one picture in April 2019, and another the week before the May 7, 2019 trial.

J.R. testified he would be released no later than August 1, 2019. He testified that he wanted to be part of A.L.R.'s life and help support her. He requested the court appoint him to be A.L.R.'s possessory conservator.

## STANDARD OF REVIEW

"Because the natural right between a parent and his child is one of constitutional dimensions," proceedings to terminate parental rights "must be strictly scrutinized." *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). Both the Texas Family Code and the Due Process Clause of the United States Constitution thus require the State to meet the heightened evidentiary standard of clear and convincing proof. *See* TEX. FAM. CODE § 161.001(b); *Santosky v. Kramer*, 455 U.S. 745, 753-58 (1982); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

We also apply a heightened standard on appeal when we review the sufficiency of the evidence to support an order terminating parental rights. In reviewing the trial court's findings for legal sufficiency, we look at all the evidence in the light most favorable to the trial court's finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so and we disregard all evidence a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* We must consider the undisputed or uncontradicted evidence in our review, even if that evidence does not support the trial court's finding. *K.M.L.*, 443 S.W.3d at 113; *J.F.C.*, 96 S.W.3d at 266. "Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence." *J.F.C.*, 96 S.W.3d at 266. If we determine from our review of the record evidence that no reasonable factfinder could form a firm belief or conviction that termination of a parent's rights is in the children's best interest, then we must conclude the evidence is legally insufficient. *See id.*

### SUFFICIENCY OF EVIDENCE TO SUPPORT BEST INTEREST FINDING

Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). A court must also presume "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE § 263.307(a). In making a best-interest determination, the factfinder looks at the entire record and considers all relevant circumstances. *See In re C.H.*, 89 S.W.3d 17, 27-29 (Tex. 2002). The Texas Supreme Court has articulated the following factors to assist our review of whether the facts and circumstances support a finding that termination of the parent's rights is in a child's best interest: (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical

danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the children; (6) the plans for the children by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list is not exclusive or exhaustive, and not every factor must be proved to find termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. Evidence establishing one of the predicate acts under section 161.001(1) may also be relevant in determining the child's best interest. *See id.* at 27-28. We turn to consideration of the factors upon which the Department relies to support the trial court's finding.

### *The desires of the child*

A.L.R. was only fourteen months old at the time of trial, and there was no evidence she was able to express her desires. The Department relies on authority that when a child is too young to express her desires, evidence the child is bonded to a foster family, spent minimal time with her parents, and has been well cared for by the foster family supports a finding that termination of a parent's rights is in the child's best interest. *See In re U.G.G.*, 573 S.W.3d 391, 402 (Tex. App.— El Paso 2019, no pet.). Here, there was evidence A.L.R. has lived with her maternal grandparents since she was a few weeks old, has bonded with them, and considers them her parents. There was also evidence she has formed bonds with her three half-siblings who also live in the home. Ramos testified J.R. has demonstrated a desire to know and become acquainted with A.L.R., but due to his incarceration, he had never visited with her and had no bond with her.

A.L.R. is not in the care of a foster family who may adopt her. Her grandmother is her primary managing conservator. Her mother's parental rights have not been terminated, and she

visits A.L.R. frequently. There is no evidence that maintaining J.R.'s parental relationship with A.L.R. would disrupt the relationships A.L.R. has formed with grandmother and her half-siblings. Under these circumstances, this factor does not support a finding that termination of J.R.'s parental rights is in A.L.R.'s best interest.

***The emotional and physical needs of A.L.R. now and in the future***

The Department presented evidence that A.L.R.'s maternal grandmother was meeting her needs, and its witnesses testified J.R. was not able to provide for A.L.R.'s physical or emotional needs at the time of trial because he was in prison. J.R. did not provide any financial support for A.L.R. while he was in prison. Although J.R. had proposed his parents as A.L.R.'s caregivers while the case was pending and he was incarcerated, the Department believed that home was "a very clear danger" to A.L.R. because K.A. (the child who died) had been living in that home when he was injured and J.R.'s parents had been "given a disposition of reason to believe for neglectful supervision." However, no factual evidence was presented to support the Department's disposition, its belief the home was dangerous, or its conclusion that J.R.'s parents had negligently supervised K.A. The record does not reflect that a home study was ever done or that any formal evaluation of J.R.'s parents as potential caregivers was ever done. And there is no evidence of the living conditions in the home, of the parenting skills or abilities of J.R.'s parents, or of their financial means. The Department's belief that the home was a "clear danger" and unsuitable for meeting A.L.R.'s needs was therefore wholly conclusory. *See In re A.L.H.*, 468 S.W.3d 738, 747 (Tex. App.—Houston [14th Dist.]. 2015, no pet.) ("Unsupported, conclusory opinions of a witness do not constitute evidence of probative force.").

The undisputed evidence at trial was that J.R. would be released from prison several months after the trial, and J.R. expressed an unequivocal desire to help provide for A.L.R., including paying child support. The Department points to Ramos's testimony that J.R. did not

have employment or the ability to provide for A.L.R., but it is clear from the record that Ramos was simply testifying that J.R. had no current income or home due to his incarceration. The record does not contain any evidence regarding J.R.'s past employment, prospective future employment, earning capacity, or where he intends to live when he is released. Thus, although there is evidence the child's managing conservator is meeting her needs, there is no evidence that J.R. did not attempt to meet her needs while he was in prison, that his proposed placement was unsuitable, or that J.R. would be unable to meet A.L.R.'s emotional and physical needs when he was released from prison.

Finally, the Department argues that "the need for permanence is a paramount consideration for a child's present and future physical and emotional needs" and that the trial court could consider that termination is in the child's best interest "so that adoption may occur rather than the impermanent foster care arrangement that would result if termination were not had." While we agree with these statements in the abstract, the Department's primary permanency goal for A.L.R. was family conservatorship, not adoption. A.L.R.'s mother's parental rights were not terminated and J.R. does not challenge the managing conservatorship appointment. Under these circumstances, the permanency goal for A.L.R. is not furthered by terminating J.R.'s rights.[2] We conclude this factor does not support termination of J.R.'s parental rights.

### The emotional and physical danger to A.L.R. now and in the future and the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one

The Department's principal argument to support the finding that termination of J.R.'s parental rights is in A.L.R.'s best interest is its contention that she is at risk of emotional and physical danger if she is in J.R.'s care. The Department's argument is based on its assertions that

---

[2] The Department's brief on this factor also asserts the trial court is entitled to consider a parent's "history of drug use" and to "give great weight" to "drug-related conduct." However, there was no evidence of any drug use or drug-related conduct presented at trial.

K.A. was injured and died as a result of J.R.'s neglectful supervision and physical abuse and that J.R. has a "history of criminal conduct."

Flood testified K.A. was injured while he was in J.R.'s parents' home and in the care of J.R. and his parents. She testified K.A. had some obvious injuries – "a big knot on his forehead [and] some bruising on his face" and that K.A. was taken to the hospital. She testified he was found to also have some rib injuries, head trauma, and "different levels of bruising throughout his body." However, the Department did not present any evidence of the circumstances in which any of K.A.'s injuries were incurred or of the cause of his death. There is no evidence of whether J.R. and his parents were or should have been aware of the previous injuries, whether they were timely treated, or what their likely cause was. There is no evidence of any conduct or failures to act on the part of J.R. or his parents that caused or contributed to any of his injuries or his death. The Department failed to present any evidence of any facts from which the trial court reasonably could have concluded that J.R., E.B., or J.R.'s parents were abusive, neglectful, or in any way culpable in the death of K.A. The Department's position of "reason to believe," unsupported by any facts, is simply a conclusory opinion. "Unsupported, conclusory opinions of a witness do not constitute evidence of probative force." *In re A.L.H.*, 468 S.W.3d at 747 (holding there was no factual basis in record to support conclusory testimony that father had knowledge environment was dangerous and stating, "[a] witness's belief is no more than mere surmise or suspicion, which is not the same as evidence"); s*ee In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) (holding "conclusory testimony, such as the caseworker's, even if uncontradicted does not amount to more than a scintilla of evidence"). That K.A. suffered injuries in the home of J.R.'s parents and subsequently died as a result of the injuries does not necessarily mean that someone in the household was abusive or neglectful, and is not, alone, clear and convincing evidence that the home or the caregivers pose an emotional or physical danger to other children.

The Department also argues J.R.'s "history of criminal conduct" supports a finding that maintaining his parental rights would present an emotional and physical danger to A.L.R. The family service plan prepared for J.R. refers to J.R. needing to address his "violent" and "extensive" "criminal history of assault, burglary and theft." However, the Department did not present evidence of any violent acts by J.R., and presented evidence of only one criminal conviction—the conviction for burglary of a habitation that was committed in 2015 and for which he was convicted in February 2016, two years before A.L.R. was born. An offense occurring before a child is born may be relevant to the best-interest determination, but the Department bears the burden of introducing evidence concerning the offense and showing how it endangers the child. *See In re E.N.C.*, 384 S.W.3d at 804-05. A court may also consider the instability that results from incarceration in its best interest analysis, but the Family Code may not constitutionally be interpreted to authorize termination based solely on the fact that a parent is incarcerated. *See id.* at 805. The Department did not produce any evidence regarding the facts of the burglary offense. The Department also produced no evidence about the reason J.R.'s probation was revoked, no evidence of any assaultive or violent conduct by J.R., and no evidence of any other conduct that resulted in criminal charges or convictions. On the record before us, this factor does not weigh in favor of terminating J.R.'s parental rights.

### *The parental abilities of the individuals seeking custody, stability of the proposed placement, and the programs available to assist these individuals to promote the best interest of the child*

The only evidence regarding the home or parenting abilities of E.B.'s mother, who was appointed sole managing conservator, is that she has custody of A.L.R. and E.B.'s three other children, she provides for their needs, and provides them a safe environment. The trial court could infer from this evidence that the conservator's parenting skills are at least adequate and the placement is stable. The record contains no evidence about J.R.'s parenting abilities or about

where J.R. would live when he is released from prison. The Department did not do a study of J.R.'s parents or their home, which is where J.R. had requested A.L.R. live while he was in prison. Although the Department believes J.R.'s parents' home is unsuitable, it offered only its witnesses' unsupported and conclusory opinions to that effect.

The Department asserts that J.R. "showed a lack of motivation to improve his parenting skills." However, its own witness contradicted this assertion. Caseworker Ramos testified J.R. had done "everything he can" to comply with the service plan. J.R. also registered for and completed a parenting class even though he was not required to do so until after his release, and Ramos testified J.R. had expressed a desire to take advantage of other services, but there were not many available in the state prison units.

The Department correctly argues that a parent's failure to complete a family service plan can support a trial court's finding that termination of the parent's rights is in the child's best interest. However, the Department did not develop a family service plan with J.R. until ordered by the court to do so, and did not present a plan to J.R. for his review until six months after the case was filed. J.R. was then housed at four different facilities between the time he signed the first plan and trial. Although the Department contends he refused to comply with the requirement that he submit to a psychological evaluation, the Department did not schedule an evaluation for him at any time after the family service plan requiring the evaluation was presented to him and signed. J.R. testified he was attempting to satisfy this requirement on his own by requesting an evaluation from the staff psychologist at the Hamilton Unit. J.R. also failed to complete the Changes Life Skills Program before trial. Ramos testified this course was available at the Dominguez Unit, where J.R. was housed in December 2018 and January 2019, and at the Hamilton Unit, where J.R. was at the time of trial. He testified that at the time of trial, he was registered for and had begun taking the course. The Department's evidence—the family service plan—shows there are

programs available to assist J.R. when he is released from prison. Caseworker Ramos testified she had no reason to believe J.R. would not follow through on those terms of his service plan upon his release from prison.

We agree A.L.R.'s current placement in a home that meets her needs and J.R.'s failure to complete the Changes program is some evidence; however, it is not legally sufficient to support a finding by clear and convincing evidence that terminating J.R.'s parental rights is in A.L.R.'s best interest.

### *The plans for A.L.R. by the individuals seeking custody*

J.R. testified he was asking the court to name him a possessory conservator of A.L.R., that he wanted to be involved in her life, and was prepared to pay child support. The Department contends this factor weighs in favor of the trial court's finding because there is no evidence of how J.R. intended to provide for A.L.R., deal with her day-to-day care, or provide for her educational needs.[3] However, this argument misapplies the standard of review and burden of proof. *See In re E.N.C.*, 384 S.W.3d at 808. The Department bore the burden to establish with clear and convincing evidence that termination of J.R.'s rights is in A.L.R.'s best interest. The Department's failure to elicit testimony about J.R.'s plans for A.L.R.'s future does not constitute evidence that he has no plans or that his plans are "weak and ill-defined," as argued by the Department. *See id.* (stating that "[a] lack of evidence does not constitute clear and convincing evidence"). Where the record does not contain any evidence on a factor, the factor cannot weigh in favor of termination.

### CONCLUSION

On this record, we conclude that no reasonable factfinder could form a firm belief or conviction that termination of J.R.'s parental rights is in A.L.R.'s best interest. We therefore

---

[3] The record also contains no evidence of how E.B. or her mother intend to provide for A.L.R., deal with her day-to-day care, or provide for her educational needs.

reverse the part of the trial court's order that terminated J.R.'s parental rights, render judgment denying the request for termination, and remand the case to the trial court for further proceedings. *See* TEX. FAM. CODE § 161.205 (when termination is denied, court may render orders in the best interest of the child); *In re E.N.C.*, 384 S.W.3d at 810; *In re J.F.C.*, 96 S.W.3d at 266. J.R. did not challenge the trial court's finding in support of its appointment of a non-parent as A.L.R.'s permanent managing conservator and we do not disturb that part of the trial court's order.

Luz Elena D. Chapa, Justice